UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

PAUL R. PLANTE, JR.,                          )
                                              )
   Plaintiff,                   )
                                              )          No. 5:17-CV-150-REW-EBA
v.                                            )
                                              )
JOHN W. SEANOR,                               )          OPINION & ORDER
                                              )
   Defendant.                   )

*** *** *** ***

     In this suit between two former ArthroDynamic Technologies (ADT) directors and shareholders, Plaintiff Paul Plante pursues recovery of half the legal fees and expenses he paid to fund the parties' joint litigation (including four or more suits in two states) against other former ADT directors and affiliates. DE 1-1 (State Court Complaint). Plante claims Defendant John W. Seanor agreed to repay 50% of the legal bills out of any recovery he received. After Seanor, despite being a co-party, covertly settled his claims, Plante sought reimbursement. Seanor sent some funds but much less than 50% of Plante's outlay. Ultimately, Plante, in a Fayette Circuit Court complaint, claimed Seanor's post-settlement failure to reimburse breached a 2011 oral agreement (and, alternatively, that Seanor was unjustly enriched by accepting the settlement proceeds without repayment of legal expenses).

     On March 28, 2017, Defendant removed this matter and answered the pending Complaint. DE 1 (Notice of Removal); DE 3 (Answer). Seanor, through discovery, admitted that the parties had an oral agreement but disputed the terms. Pl's Ex. 7 at 3. Defendant claimed his promise was only "to allow Plante to retain any monies set aside

1

or awarded for legal fees in connection with the lawsuit." *Id.* The Court conducted a two-day bench trial. DE 57 & 59 (Minute Entries). Per the parties' stipulation, the Court admitted 38 Plantiff's and 10 Defendant's Exhibits; Plante, Seanor, and their former counsel, Hon. William Rambicure, testified. The Court heard both opening statements and closing arguments, the latter being extensive.

Having considered the full record, the Court **FINDS** that the parties' deal was for Plante to advance the legal expenses and for Seanor to repay half out of any settlement. Further, the Court finds that Seanor's failure to recompense Plante for the full 50% breached the oral agreement. The Court enters a separate Judgment consistent with the following reasoning and findings.

## I.    INTRODUCTION

### a.    *Jurisdiction & Venue*

The Court has jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1332. Section 1332(a) grants district courts original jurisdiction in "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]" Plante, a Florida citizen, claims Seanor, a Georgia citizen, owes him $117,915.40. *See* DE 1 at ¶ 3; DE 1-1 at ¶¶ 2, 19. Accordingly, the Court has original jurisdiction over this action.[1]

Further, venue is proper in this District pursuant to 28 U.S.C. § 1391(b), which provides that an action may be brought where "a substantial part of the events or

---

[1] Removal was proper under 28 U.S.C. § 1441(a): "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." Fayette Circuit Court is located in the Eastern District of Kentucky.

omissions giving rise to the claim occurred." *Id.* The Court's findings, below, detail the relevant events. For now, suffice it to say numerous critical events (much of the underlying litigation, a mediation, etc.) and many of the key individuals (*e.g.*, majority recipient of the at-issue fees, Rambicure) trace to this District.

b.      *Question presented.*

The case presents one key question: What were the terms of the parties' 2011 oral agreement? The parties undoubtedly reached an accord over the joint pursuit of litigation. Finding the terms drives the decision here.

The Court first describes the events leading to the agreement, next resolves the dispute over terms, then evaluates breach timing, and finally assesses the proper measure of damages. Ultimately, the facts and law compel a result in Plante's favor. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes and memorializes the following findings of fact and conclusions of law.

## II.     FINDINGS & CONCLUSIONS

a.      *Background*[2]

Defendant Seanor, Frank Marcum, and James Conway formed ADT, a Kentucky corporation, in January 2006. Pl's Ex. 20 at 4. By February 2006, the shareholder roster expanded to six, with percentage ownership as follows: Marcum (37.5%), Conway (37.5%), Marcus Cheney (10%), Foster Northrop (5%), Defendant Seanor (5%), and Plaintiff Plante (5%). *Id.* at 8. Pursuant to the ADT Shareholders Agreement, each of the

---

[2] The Court, for brevity's sake, provides a short summary of the events preceding the critical period for this case. The background is necessary for a cogent narrative, though not directly relevant to the ultimate result. The Court describes third-party conduct only as related by Plante and Seanor in the current record. To be clear, the Court makes no findings regarding the accuracy of the Plante/Seanor stories as to third-party conduct.

six joint-owners possessed equal voting power for purposes of electing directors and officers. *Id.* at 10. Through 2010, Marcum served as ADT President & CEO, and Conway served as Board Chairman. *Id.* at 11. Beginning in 2008, Conway raised concerns with other shareholders regarding Marcum's use of company funds and other alleged improprieties in his role as ADT President. *Id.* at 11, 29–30. In June 2010, Conway, Cheney, Northrop, Plante, and Seanor, meeting as the ADT Board, unanimously voted to remove Marcum from the presidency. *Id.* at 14.

From 2005–2010, Conway was employed by Bioniche Animal Health USA, Inc. *Id.* at 20. Bioniche, in 2005, contracted with ADT for supply, manufacture, sales, marketing, and distribution services related to its "POLYGLYCAN®" equine joint treatment products. *Id.* at 16. In February 2010, ADT entered into a written Letter of Intent with Dechra Veterinary Products, Inc., for Dechra's purchase of ADT's equine-related assets. *Id.* at 17. The LOI envisioned an $11,000,000 cash payment along with certain royalty payments and contingent payments for future products developed under the ADT patents' coverage. *Id.* Bioniche, via prior agreements, possessed a right of first refusal and opportunity to match the Dechra offer. *Id.* Bioniche's proposal fell short of the $11,000,000 Dechra offer. *Id.* at 19. Nonetheless, Conway pushed for a new deal with Bioniche and, ultimately, secured the support of Cheney and Northrop. *Id.* at 22.

Based on these events (and others), four ADT Board members (and minority shareholders), Northrop, Cheney, Seanor, and Plante, voted, in March 2011, to sue Marcum and Conway for misappropriations of corporate funds, breaches of fiduciary duties, and conflicts of interest. *Id.* at 39.

*b.*      *The Takeover*

Around August 2011, Marcum began negotiating with Conway, Northrop, and/or Cheney to "grab complete dominion and control over ADT." *Id.* at 56. In August, September, and October of 2011, Marcum in fact purchased ADT shares from Conway (Pl's Ex. 32 at 54), Northrop (*id.* at 62), and Cheney (*id.* at 40). As part of the agreements, Marcum agreed to pay a set price per share ($60,000 for Conway; $70,000 for Cheney & Northrop) as well as a royalty calculated as a percentage of adjusted gross sales (4.5% for Conway & .06% for Cheney & Northrop). *Id.* at 42 (Cheney), 56 (Conway), 64 (Northrop). Cheney & Northrop also assigned Marcum the exclusive right to vote their shares. *Id.* at 50 (Cheney), 73 (Northrop).[3] Per Plante and Seanor, the Marcum buy-sell contracts were invalid under the ADT Shareholders Agreement. Pl's Ex. 20 at 60–61, 64.

Ultimately, at an October 31, 2011, ADT Board meeting—over Plante and Seanor's objections—Marcum, Conway and Cheney voted Seanor out of ADT's presidency. *Id.* at 69–70. Marcum then resumed control of ADT and, on the Company's behalf, instructed ADT's counsel in the suits against himself, Conway, and Bioniche to stand down. *Id.* at 70–71. A November 26, 2011, vote officially terminated Seanor's compensation, health insurance and other benefits. *Id.* at 72.

---

[3] Plante and Seanor both swore that Marcum was "secretly negotiat[ing] deals to purchase the ADT stock owned by Conway, Northrop, and/or Cheney and thus grab complete dominion and control over ADT[,]" and that "Marcum and Conway kept [ ] Seanor and Plante in the dark with respect to these secret negotiations, and, upon information and belief, Marcum and/or Conway persuaded Northrop and Cheney to do the same." Pl's Ex. 20 at 56.

c.     The Agreement, the Litigation, and the Settlement

After Seanor's removal, Plante and Seanor (no later than November 1, 2011, *see* Pl's Ex. 15 at 3) began and/or continued discussions with counsel in Kentucky and Florida. The talks concerned strategy for filing lawsuits against Marcum and the other ADT shareholders based on the takeover. At this time (early November 2011), Plante and Seanor made the oral agreement at the core of this suit. Neither side disputes the *existence* of a verbal agreement with respect to litigation freight—*see, e.g.*, Pl's Ex. 7 at 3 (Seanor Interrogatory Response)—and both sides acknowledge that Plante's end of the bargain was to front all of the legal fees and expenses for the Plante-Seanor litigation. *See, e.g.*, *id.*; Pl's Ex. 2 (Seanor 12/12/11 e-mail: "Paul was to be solely responsible for the fees. . . . My agreement with Paul is that I will settle up with him when we settle with Marcum and/or ADT."). [After all, Seanor had just lost his job and could not afford to fund the litigation.] However, the parties' versions diverge regarding the details of Seanor's obligations.

Seanor contends that his only agreed repayment duty was to give Plante "any portion of a verdict or settlement agreement that was awarded for attorney fees[.]" Pl's Ex. 7 at 3. Thus, per Seanor, because he did not receive legal fees, he owed Plante nothing. Plante, for his part, insists that Seanor agreed to repay 50% of the fees out of any recovery Defendant received from Marcum and/or ADT. The proof, as detailed below, clearly and convincingly supports Plante's version.

Plante credibly testified to the existence of the agreement on the terms described above. The Plante terms are corroborated by and consistent with both parties' communications during the relevant period. *See, e.g.*, Pl's Ex. 2 (Seanor 12/12/11 e-mail:

"Paul was to be solely responsible for the fees. . . . My agreement with Paul is that I will settle up with him when we settle with Marcum and/or ADT."). Rambicure testified that he believed Seanor and Plante "made separate arrangements" for repayment. Seanor's own correspondence (in August of 2012) implicitly recognized his duty to pay an equal share of attorney fees. Following a formal mediation, Seanor described the implications of a hypothetical settlement scenario in which Plante and Seanor receive 20,000 units of Polyglycan as part of their deal, with separate recovery of "[a]ttorney fees off of the table[,]" as follows:

> [A]t an average net cash value to us of $40 = $800,000 ($400,000.00 each). From that, **we will have to** pay income taxes . . . and **pay attorney fees leaving us a net of less than $200K each**.

Pl's Ex. 34 at Plante-0425 & 0426 (emphasis added). Thus, just months after the litigation launched, Seanor's hypothetical strongly demonstrates a shared endeavor, where Plante and Seanor would split the expense burden and end in the same net position, under equal terms, as part of a settlement. Indeed, in this voluminous record, the only proof directly contrary to Plante's averred terms is Seanor's description of the agreement. Seanor's version, first raised 5+ years after the events in question and only when faced with the instant litigation, is mostly (almost entirely) founded on Seanor's word. The Court, based on a multitude of factors and as detailed below (§ d.), finds Seanor's testimony regarding the agreement's terms incredible.

Plante and Seanor filed (or joined) suits against Marcum, Conway and others in Florida and Kentucky. Until May of 2013, Seanor was an active participant in, indeed a driving force behind, the litigation. He sent reams of e-mails to the parties' counsel and accountants. *See generally* Pl's Exs. 22, 24, and 25. Rambicure testified that Seanor was

an active party and frequently directed him to keep the pressure on Marcum and ADT. Rambicure, at Plante's expense, defended a counterclaim brought solely against Defendant. Seanor participated in two mediations, but did not settle, and by all appearances intended to move forward with the suits. However, on May 6, 2013, Seanor abruptly notified Plante and Rambicure that he had accepted a buy-sell offer from Marcum; he settled his claims for a $700,000 cash payment and .06% royalty on ADT-patented product sales. Nonetheless, Plante also funded Seanor's (disputed) exit from the litigation. That is, Seanor settled on his own, shrouded from his lawyer and co-party, but he then looked to Rambicure, on Plante's dime, to effect his removal from the suit. Pl's Ex. 29. That took several months' worth of effort by Rambicure.

Ultimately, on July 11, 2013, Plante e-mailed Seanor a detailed accounting of the legal costs paid and outstanding—Plante requested 50% reimbursement. Pl's Ex. 9. Seanor did not challenge his duty to repay or the accounting (in fact, he remarked that he did not doubt the statement's accuracy, Pl's Ex. 18 at Plante-0125) at the time, or in response to any of Plante's repeated follow-up requests. *See generally id.* Yet, Seanor ultimately only paid $35,000, less than 1/3 of the 50% repayment ($119,800.11) Plante requested in July 2013.

Having set the stage with the preceding general summary, the Court addresses its concerns regarding Seanor's credibility. For the reasons discussed below, the Court rejects Seanor's claim that his repayment duty was contingent upon an attorney fee recovery. That testimony, specifically, conflicts with all credible record proof. Documentary evidence also belies much of Seanor's other testimony. Further, the trial

exhibits contain other examples that impeach Seanor. The Court finds Seanor not credible as a witness in this case.

>    *d.*    *Credibility*

First, the same Seanor communications that support Plante's theory (discussed above) obviously refute Seanor's testimony regarding the agreement's terms. Also vital are Seanor's responses to (or, often as not, silence following) Plante's post-settlement requests for payment. Exemplary, and perhaps the weightiest evidence in the record, are two July 2013 e-mails. On July 11, Plante sent Seanor the detailed accounting mentioned above—an attached worksheet explicitly broke the costs down pursuant to the Plante-proposed terms (50/50 split). Pl's Ex. 9. Plante reminded Seanor that his litigation outlays allowed Seanor to settle on terms comparable to Northrop and asked Seanor to "arrange payment" for the 50% reimbursement. *Id.*. Seanor's response, the very next morning, speaks volumes: "I wasn't sure where was best to send the check for legal fees – do you want it to go to your office or home . . . [p]lease e-mail me the correct address." Pl's Ex. 18 at Plante-0120. Seanor's 2013 conduct is simply inconsistent with his trial testimony and strongly indicative of a 50/50 deal.

The record is replete with similar Plante requests for a 50% repayment. *See generally* Pl's Ex. 18 & 19. Tellingly, Seanor never opposed such requests, much less argued that his failure to obtain a fee award or recovery obviated the repayment duty. Rather, Seanor sent Plante $25,000 and $10,000 checks, respectively, for "Legal Fees Seanor et al v. Marcum et al" and "ADT/Rambicure[.]" Pl's Ex. 10. [Seanor's claim, at trial, that he had no hand in creating the checks' subject lines further damaged his credibility. Suffice it to say the Court strongly doubts that Seanor's counsel (and

appointed agent) would send funds held on a client's behalf to a third-party without explicit direction. Indeed, Seanor represented to Plante that he had "sent written instructions" to his counsel regarding a check. Pl's Ex. 18 at Plante-0123.]

Two key implications attend the defense's theory: (A) any attorney fee award would be effectively valueless to Seanor because he already bargained away any claim thereto; and (B) accrual of attorney fees was irrelevant to Seanor's ultimate recovery because he had no duty to pay them from an undifferentiated recovery—*i.e.*, Plante paid them up front and either Plante or Marcum/ADT would foot the ultimate bill. Yet, Defendant's communications suggest he cared deeply about recovering attorney fees and that he was acutely aware of rising legal costs.

Seanor, post-mediation, expressed concern that: "We gave up a lot during the negotiation [by taking] the [a]ttorney fees off the table[.]" Pl's Ex. 34 at Plante-0426.[4] In explaining his motives for settlement, Seanor (bargaining *ex parte* with Marcum) noted that: "The litigation is likely to drag on with attorneys reaping the benefits." Pl's Ex. 28 at Seanor-0003. Later, instead of disputing *his duty* to repay, Seanor (communicating with Plante after the 50% reimbursement request), questioned the validity of the Rambicure bills. Pl's Ex. 18 at Plante-0125.[5] Seanor's fee-related statements paint him as a man who knew he was on the hook for 50% of the costs, payable from any recovery.

_____

[4] Plante also testified that Seanor did not disclaim responsibility for fees after it became clear that such recovery was unavailable via mediation. Under Seanor's proposed terms, the negotiation result would have effectively guaranteed Plante's sole responsibility to cover the full litigation costs. In this scenario, Plante surely would have expressed disquiet over the loss of a legal expense recovery. Tellingly, the record (A) indicates that the loss of attorney fees disturbed Seanor and (B) contains no proof of mirroring Plante unease.

[5] Any claim that Seanor was concerned about fees for Plante's sake rings hollow in light of the Seanor-Marcum settlement negotiations. Particularly, the Court notes Seanor's

Seanor's flippant regard for his own prior sworn statements also leads the Court to question his veracity at trial. On April 23, 2012, Seanor verified, under oath (Pl's Ex. 20 at ¶ 146), that the Marcum/Northrop buy-sell agreement was invalid and "in contravention of the terms the ADT Shareholder Agreements[.]" *Id.* at ¶ 61. Yet, less than thirteen months later (on May 3, 2013), Seanor accepted a Marcum buy-sell offer on terms virtually identical to the Northrop offer. *See* Pl's Ex. 32 at 78–81. And, on February 12, 2015, Seanor, as affiant, explicitly attested to his own contract's validity. *Id.* at 76–77. Thus, the record contains two sworn-Seanor statements that are facially contradictory.

When confronted with these disparities at trial, Seanor's evasive responses consisted of wholly unpersuasive and incomplete attempts to distinguish his buy-sell from the offers he swore were invalid. That testimony is particularly concerning given that Seanor explicitly asked Marcum for "buy sell documents . . . **under the same terms as Foster [Northrop] received**[.]" Pl's Ex 28 at Seanor-0066 (Seanor 4/22/13 e-mail to Marcum) (emphasis added). The dubious inconsistencies between Seanor's past sworn statements (and conduct) provide a strong basis for doubting his current candor and trustworthiness as a case witness.

Further, Seanor kept his settlement efforts with Marcum secret, for 3+ months, from Plante and their shared counsel. *Compare* Pl's Ex. 28 at Seanor-0003 (Seanor

---

attempt to bargain for a severance package, *see* Pl's Ex. 28 at Seanor-0016, and attested failure to negotiate for attorney fees (and ultimate explicit release of any claim). The stark contrast between these two tactics belies an inference that Seanor was altruistically motivated. The Court is persuaded that self-interest spurred Seanor's fee-related fears. Seanor's self-serving worries about the legitimacy and magnitude of legal bills are, of course, inconsistent with an agreement that left him with no responsibility for such costs absent a formal award of or allocation for fees.

2/13/13 e-mail to Marcum: "Obviously, I will keep our discussion in confidence while we explore whether there is some common ground."), *and id.* (embedded Marcum 2/4/13 e-mail to Seanor: "Jim C . . . indicated you may have an interest in selling your shares."), *with* Pl's Ex. 29 (Seanor 5/6/13 e-mail to Plante noticing buy-sell acceptance).[6] *See also* Pl's Ex. 28 at Seanor-0124. During this period, Seanor, to Plante and retained counsel, maintained the appearance that he intended to go forward with the suits. Indeed, as late as March 5, 2013—**the same day he proposed to release his claims against Marcum**, Pl's Ex 28 at Seanor-0016—Seanor was pressing for a "conference call to get a game plan moving forward" and proposing enlistment of another attorney to "jump back in and help get caught back up on some of the more routine maneuverings like scheduling depositions, discovery requests, corporate issues." Pl's Ex. 22 at Plante-0500.

In early 2013, Seanor was telling both Marcum and Plante (at-best) self-serving half-truths. He urged Plante to expend more funds in suits Seanor had no present intention of seeing through. Seanor then leveraged the prospect of litigation "heat[ing] up" to pressure Marcum to deal. *See* Pl's Ex. 28 at Seanor-0124 (Seanor, on 4/11/13, urging Marcum to get the agreement signed). Seanor did not disclose his driving role to Marcum. Instead, he blamed the potential increased litigation intensity on Plante. *See id.* ("[T]he litigation is getting ready to heat up . . . especially now that Paul is back in the USA."). Seanor's lack of candor in 2013 is a shadow on his truth-telling.

---

[6] Notably, Seanor's desire to hide the negotiations from his co-plaintiff did not deter Seanor from leveraging the litigation to pressure Marcum to deal. *See* Pl's Ex. 28 at Seanor-0124 (Seanor 4/11/13 e-mail to Marcum: "As I mentioned to you several weeks ago, the litigation is getting ready to heat up again – especially now that Paul is back in the USA. It would be helpful for us both to get the agreement signed soon.").

Seanor insisted, at trial, that the Plante-funded suits did not actually benefit him (*i.e.*, that he got the same, $700,000 + .06% royalty settlement he could have gotten in 2011) and, relatedly, that he only joined at Plante's insistence. Seanor evidently spun this yarn to explain Plante's alleged agreement to one-sided terms and to refute any claim that Plante enriched Seanor by funding the suits. However, Seanor's documented communications highlight strong independent motives for joining the suit and establish clear Seanor benefits. Consequently, Seanor's trial tale stands riddled and his overall credibility further damaged.

Defendant relied heavily on the material identity between Northrop's 2011 buy-sell and Seanor's 2013 terms in denying enrichment. Yet, the fact that Marcum gave Seanor the Northrop terms *after a year of litigation* hardly establishes that he would have offered them without the intervening Plante-funded suits. The only corroborative proof is Seanor's untethered testimony that there was "standing knowledge" that Marcum would give any shareholder the same terms. Yet, the balance of the record strongly suggests otherwise. Plaintiff explicitly testified that he and Seanor were not offered the same deal. When Marcum extended the 2011 offer, he needed Northrop's voting power to secure a majority under the ADT Shareholders Agreement's one-man, one-vote provisions. *See* Pl's Ex. 20 at 10. [Plante, at trial, confirmed Marcum's enfranchisement motive.] After securing Northrop's & Cheney's votes, Marcum had the majority he needed to oust Seanor and reclaim his seat as ADT President. The defense offered no credible basis to

believe that Marcum would have offered Seanor the Northrop terms after he had the votes he needed for the ADT takeover and without the prod of litigation.[7]

Proof that the Plante-funded suits wrought great Seanor benefits permeates the record. Seanor, himself, testified that he and Plante agreed to pursue a "shock and awe" strategy against Marcum; this included filing suits in both Kentucky and Florida. The principal goal of this tactic—and (as all three witnesses agreed) the litigation generally—was "to drive the other side to the bargaining table[.]" *Id.* All trial witnesses described a settlement as the aim. At a February 2012 mediation, Marcum offered Plante and Seanor only $300,000 each for their 5% ADT stakes. Afterward, the mediator advised Plante and Seanor that they needed to "bloody [Marcum/ADT] up a little bit" before trying to settle. At an August 2012 mediation, the offer grew to $600,000 with a .06% continuing royalty. It was not until December 2012—more than a year after Plante and Seanor began retaining lawyers, *see* Pl's Ex. 5—that Marcum offered terms comparable to Seanor's ultimate recovery. Further, Seanor, as late as November 2012, expressed concerns regarding the "threat" of the possible "squeeze merger." Pl's Ex. 35 at Seanor-0291. This was a trial trope. Rambicure testified that a merger could have resulted in a significant depreciation of Plante and Seanor's ADT shares.[8] Stated simply, Seanor used the litigation both as a lever for settlement and as a shield against share devaluation. *See* Pl's

---

[7] Moreover, even if Marcum would have given Seanor the same terms pre-litigation, that would hardly guarantee that Seanor, at contract formation, saw no benefit to the suit. Indeed, the proof shows Seanor wanted better terms than Marcum gave Northrop (an agreement that, again, Seanor swore was invalid); that belief persisted, even after the Northrop terms were on the table, into 2013 when Seanor was still negotiating for his severance package on top of the Northrop terms.

[8] The Court perceives no need to resolve the parties' dispute regarding the magnitude of such depreciation. Both sides shared the motivating fear that there was potential for reduction. More importantly, Seanor certainly recognized it as a threat in 2012 worthy of warding off through litigation (on Plante's dime).

Ex. 28 at Seanor-0124 (Seanor 4/11/13 e-mail to Marcum: "As I mentioned to you several weeks ago, the litigation is getting ready to heat up again – especially now that Paul is back in the USA. It would be helpful for us both to get the agreement signed soon."). These are valuable benefits and obvious indicators of independent Seanor motive.

Relatedly—and given the premise that he had no independent impetus for filing suit—Seanor also testified that he joined the litigation only because Plante recruited (begged) him. The benefits from Seanor's entry, described above, circumstantially discredit this claim,[9] Plante explicitly refuted the narrative at trial, and the documentary evidence directly undercuts the theory. Seanor was no mere reluctant recruit or passive passenger; the record clearly paints him as a litigation driver. Rambicure testified to as much, and the direct proof so corroborates. For example, in November 2012, after the third mediation failed, Seanor proposed noticing **19 depositions**. Pl's Ex. 36. Seanor and Plante both testified to multiple Seanor flights to Florida for litigation-related meetings. *See also* Pl's Ex. 4 at Plante-0276 (Seanor suggesting that he be the sole Plaintiff against Bioniche—but only with Plante's "continued financial support").

In sum, Seanor's narrative regarding his motives for entering the suit and the benefits Plante conferred by fronting the costs is wholly at odds with his prior conduct and the documentary proof.

For all the reasons described, the Court finds Seanor's overall testimony incredible. Plante testified sincerely and credibly that Seanor agreed to repay him 50% of

---

[9] The Court also notes that Plante's ultimate recovery of a significantly higher settlement, despite Seanor's departure and sworn opposition to at least one aspect of Plante's claims, discredits the sub-theory that Seanor's assistance was indispensable to Plante's efforts.

the advanced fees from any recovery. Seanor's testimony was the pillar of the defense's counter-argument. With Seanor having failed to credibly support it, the foundation for the defensive theory crumbles. Accordingly, Plante's testimony stands virtually unopposed by credible record evidence and well supported by direct proof. On the whole, the Court views the full record as overwhelmingly favoring Plaintiff.

      *e.*     *Count I – Breach of Oral Contract*

Plante, under Kentucky law, must prove the alleged agreement's existence with clear and convincing[10] evidence. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001) (quoting *Industrial Equip. Co. v. Emerson Elec. Co.*, 554 F.2d 276, 288 (6th Cir. 1977)). A Kentucky contract has three elements: offer and acceptance, full and complete terms, and consideration. *Rouse v. Farmer*, No. 2015-CA-001626-MR, 2018 WL 2078030, at *4 (Ky. Ct. App. May 4, 2018). The evidence clearly and convincingly establishes that Plante offered to advance all legal fees and expenses incurred in the parties' joint litigation in exchange for repayment of 50% of such costs out of any Seanor recovery and that Seanor accepted. These terms, in context, are "sufficiently complete and definite to enable a court to determine the measure of damages in the event of breach." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). The agreement established the what (fees and costs), when (upon Seanor's recovery), and how (repayment measured as 50% of all expenses). This suffices. *See Auto Channel, Inc.*, 144 F. Supp. 2d at 790 ("[T]he agreement need not cover every conceivable term of the

---

[10] The Kentucky Supreme Court has described clear and convincing evidence as "substantially more persuasive than a preponderance of evidence, but not beyond a reasonable doubt." *Fitch v. Burns*, 782 S.W.2d 618, 622 (Ky. 1989). Kentucky substantive law applies in this diversity case. *Gasperini v. Ctr. for Humanities, Inc.*, 116 S. Ct. 2211, 2219 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

relationship[.]"). Though informal and concise, the agreement, struck between sophisticated and familiar parties in the stress of the late 2011 ADT tumult, is clear as to the terms and performance parameters. The Court so finds.

Plante proved the oral contract, and the Court has little trouble finding, under the same standard,[11] that he established the remaining elements of a Kentucky contract claim: breach and "damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). Only two issues complicate the Court's resolution: breach timing and damage quantity.

Seanor's recovery from Marcum triggered his duty to repay. The question, however, is when was repayment due? *See* Restatement (Second) of Contracts § 235 (1981) ("(2) When performance of a duty under a contract is due any non-performance is a breach."). There is no record indication that the parties expressly or impliedly contracted for immediate repayment—or, indeed, specifically addressed payment timing. *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 498 (E.D. Ky. 2002) ("[U]nless the intention to make time the essence of the contract is clearly expressed, or necessarily implied, it will not be so regarded." (quoting *Rogers Bros. Coal Co. v. Day*, 1 S.W.2d 540, 541 (Ky. 1927)). "When the parties to a . . . contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." *Bank of New York v. Janowick*, 470 F.3d 264, 271 (6th Cir. 2006) (quoting Restatement (Second) of Contracts § 204). Kentucky courts facing contractual silence look to "parol and extrinsic evidence

---

[11] The Court directed the parties to address the burden of proof applicable to breach and damages for an oral contract claim under Kentucky law. The parties were unable to unearth any clear case law. Ultimately, the Court finds resolution of the applicable burden unnecessary, as explained.

involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002). Simply stated, Kentucky adheres to the venerable saying: "Show me what the parties did under the contract and I will show you what the contract means." *Thompson v. Fairleigh*, 187 S.W.2d 812, 816 (1945).

Here, the circumstances establish that Seanor breached no later than July 22, 2013. Seanor settled on May 3, 2013, and was to receive, at closing, 50% of his $700,000 recovery.[12] On July 11, 2013, Plante requested payment. Seanor did not dispute that his performance was then due but, instead, requested only clarification as to where to send payment. Arguably, Seanor's failure to remit payment after receiving notice (on July 12) constituted breach.[13] However, the Court interprets Plante's silence prior to a July 22 follow-up e-mail as an allowance of reasonable time for Seanor to perform. *See* Pl's Ex. 18 at Plante-0124 (Plante 7/22/13 e-mail to Seanor "following up" on previously requested payment). Nonetheless, Plante's July 22 message made clear that Seanor's failure to timely perform was injuring Plaintiff (*e.g.*, by preventing him from filing his taxes) and that any reasonable compliance period had, by then, expired. *Id.* With his money in hand, Seanor's failure to timely repay breached the parties' agreement. Restatement (Second) of Contracts § 235 cmt. b ("When performance is due, however, anything short of full performance is a breach, even if the party who does not fully

---

[12] On September 9, 2013, Seanor confirmed his receipt of partial Marcum payment (though he claimed it was less than the $350,000 due). Pl's Ex. 18 at Plante-0125.

[13] Seanor, on September 9, 2013, acknowledged that his $25,000 payment to Plante was "not what [Plante] [was] expecting[.]" Pl's Ex. 18 at Plante-0125. Seanor, failing to challenge Plante's communicated expectations, implicitly acknowledged that the July request was reasonable.

perform was not at fault and even if the defect in his performance was not substantial.").[14] Accordingly, the Court must calculate appropriate damages.

### f.    *Damages*

Accounting for Seanor's $35,000 in partial payments, Plante proved $71,965.63 in damages flowing from Seanor's breach. The amount due under the contract includes $98,645.33 as Seanor's half of payments made before Plante's July 11, 2013, accounting. Though Seanor did not dispute the full $100,239.08 amount stated, the Court finds (and Plaintiff conceded at trial) that the $3187.50 paid to Devine Goodman were for services rendered before the Plante-Seanor agreement. Plante paid only his share of those. Thus, the Court reduces Seanor's share by half the total Devine Goodman payments ($100,239.08 - $1593.75 = $98,645.33).

The July 2013 statement lists $119,800.11 as Seanor's share of the outstanding, unpaid legal bills. However, Plante ultimately paid only $50,935.42 (without equivalent Seanor contributions) to settle the accounts. RLG accepted an escrow balance, belonging equally to Plante and Seanor, in satisfaction of its remaining bills. Pl's Ex. 17. The account release, totaling $19,064.58, retired the Rambicure balance and came equally from Plante and Seanor. *Id.* Plante also paid Miller & Wells ("MW", Rambicure's subsequent employer) $10,000 twice—on October 30, 2013, and again on January 28, 2014. *See* Pl's Ex. 33 at  Plante-0744 & 0745. MW ultimately (on August 3, 2016) accepted $30,935.42 for a then-invoiced balance of $103,098.40. Pl's Ex. 17; *see also* Pl's Ex. 33 at Plante-0826. The Court finds the oral agreement covered some, but not all,

---

[14] The principle that a partial-performance remains a breach even when the breaching party is faultless enervates Seanor's legion excuses for his failure to pay. *See, e.g.*, Pl's Ex. 18 at Plante-0123 ("we were burglarized last night"), *id.* (my attorney was "out of the office last week").

of the MW payments (totaling $50,935.42). As of Seanor's last invoiced involvement (on August 1, 2013), the MW balance stood at $40,213.54. Pl's Ex. 16 at Plante-0086. Thus, approximately 32.67%[15] of the total MW fees were attributable to joint Plante/Seanor representation. The Court sees no persuasive basis for applying Seanor's half-repayment duty to a larger portion of the negotiated total payments. Indeed, this ratio gives Seanor an appropriate share of the MW write-down for his time on the scene. Thus, the Court finds that $16,640.60[16] of Plante's MW payments fell within the parties' deal with half that amount, $8320.30, representing Seanor's share.

Accordingly, Seanor owed Plante $106,965.63[17] under the contract. Deducting Seanor's $35,000 in partial payments results in a total damages figure of $71,965.63.[18] The Court so finds.

g.    *Prejudgment Interest*

Plaintiff submitted a trial brief requesting prejudgment at 8% compounded annually. DE 55. The Court gave the defense until October 22, 2018, to file a responsive brief. DE 56 (Minute Entry). Defendant's deadline expired sans filing. The Court, for the following reasons and given Seanor's failure to challenge the merits of Plaintiff's request, awards Plante prejudgment interest at the rate requested.

"In diversity cases, state law governs prejudgment interest and federal law governs postjudgment interest." *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 753 F. Supp. 2d 665, 667 (E.D. Ky. 2010). In Kentucky, "prejudgment interest follows a liquidated claim

---

[15] $40,213.54 / $123,098.40 = .326678 (The Court arrived at the $123,098.40 figure for total fees by adding the $20,000 in prior payments to the final MW invoiced total.)
[16] $50,935.42 * .3267 = $16,640.60171
[17] $98,645.33 + $8320.30 = $106,965.63
[18] $106,965.63 - $35,000 = $71,965.63. Because the escrow funds were half Seanor's, he owes no more for that aspect of the Rambicure bill.

even if the refusal to pay is based upon 'good faith denial of liability.'" *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 633–34 (6th Cir. 2000) (quoting *Hale v. Life Ins. Co. of North America*, 795 F.2d 22, 24 (6th Cir. 1986). Plante's claim qualified as liquidated, if contingent, under Kentucky law no later than the date he paid the fees. *See 3D Enterprises Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005) ("Liquidated claims are 'of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values.'" (internal citation omitted). Under the circumstances, Plante is "*entitled* to interest at the legal rate of eight percent (8%) per annum from the date that each payment was due and remained unpaid." *Pursley v. Pursley*, 144 S.W.3d 820, 828 (Ky. 2004) (emphasis added) (footnote removed); *see also* KRS 360.010 ("[T]he legal rate of interest is eight percent (8%) per annum[.]"). Plante's payments do not start the clock but do show the liquidated nature of the claims.

Further, "[u]nder Kentucky law, courts have discretion to award either simple or compound prejudgment interest, though the default is simple interest." *Travelers Prop. Cas. Co. of Am. V. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010). The Kentucky Court of Appeals has described circumstances in which "fairness justifie[d] and indeed dictate[d]" a compound award:

> Reliable has deprived Naylor of the use of the money rightfully due and owed to it for nearly eight (8) years. Arguably, Naylor would have been capable of earning compound interest on its money during this lengthy time period. We note parenthetically that commercial lending and saving institutions no longer offer simple interest rates.

An award of compound pre-judgment interest in this case does not constitute a punitive reprisal as to Reliable. Rather, it is an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor. The court's award of compounded pre-judgment interest reconciles and adjusts that inequitable result by providing to Naylor a sum that it might have earned had its money been tendered in a timely manner. Any other holding would diminish the real value of Naylor's recovery in this case. The trial court did not abuse its discretion by awarding compound pre-judgment interest.

*Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 858 (Ky. Ct. App. 2003). The same economic realities that justified compounding in *Naylor* warrant Plante's (unchallenged) request for compounding here.

Fairness, too, necessitates a compound award. Defendant's ultimate $700,000 + royalty recovery was a drastic increase from the pre-litigation status. The record strongly ties Seanor's result to case pressure. Indeed, Seanor explicitly leveraged Plante's litigation outlays in his negotiations with Marcum. The Plante-funded suits warded off a feared merger. Plaintiff fully paid for a Seanor-counterclaim defense and footed the bill when Seanor's post-settlement exit drew objections. Nonetheless, Plaintiff never asked for more than the 50/50 split upon which the parties agreed. Plante repeatedly advised Seanor of the difficulties his failure to pay were creating. *See, e.g.*, Pl's Ex. 18 at Plante-0121 ("This is holding up the filing of my prior year tax returns[.]"). Seanor, never disputing that he owed Plante, still withheld payment for years. In short, the equities strongly favor Plante's unopposed compounding request.

As discussed above, the claims based on amounts paid prior to July 11, 2013, came due on July 22, 2013. Given Seanor's prior default, Plante's settlement of MW the bill, on August 3, 2016, tacked on a $8320.30 liquidated claim. The Court provides the

following guidance as to proper interest calculation. 8% accrual applies to the following amounts for the stated periods:

--      $98,645.33 from July 22, 2013, through September 4, 2013;

--      $73,645.33[19] from September 5, 2013, through December 31, 2013;

--      $73,645.33 plus 2013-accrued interest from January 1, 2014, through January 12, 2014;

--      $63,645.33[20] plus 2013-accrued interest from January 13, 2014, through December 31, 2014;

--      $63,645.33 plus 2013- and 2014-accrued interest from January 1, 2015, through December 31, 2015;

--      $63,645.33 plus 2013-15-accrued interest from January 1, 2016, through August 2, 2016;

--      $71,965.63[21] plus 2013-15-accrued interest from August 3, 2016, through December 31, 2016;

--      $71,965.63 plus 2013-16-accrued interest from January 1, 2017, through December 31, 2017;

--      $71,965.63 plus 2013-17-accrued interest from January 1, 2018, to judgment date.

In sum, then, the Court specially finds that an oral contract existed concerning the expenses (fees and costs) for the various pieces of joint litigation undertaken by Plante and Seanor. Plante clearly proved that his version was the actual agreement, that Plante would front the expenses and that Seanor would repay his share from any recovery.

---

[19] Seanor's $25,000 payment.
[20] Seanor's $10,000 payment.
[21] Seanor's $8320.30 share of Plante's settlement with MW.

Seanor's version, that he simply assigned the right to any statutory fee award, is not credible and was not the parties' deal. A settlement/buy-out was always the litigation goal. Seanor accomplished that and owed Plante his expense share on consummation. The Court finds breach and liability, as detailed and premised on the conclusions of law with respect to the contract and applicable remedial analysis.

      h.      *Counts II & III - Equitable Claims*

Finally, the Court takes up Plaintiff's equitable theories. The Court rejects Count II, money had and received; the facts are simply a poor fit for the claim:

> Where one receives money, whether tortiously or improperly, **that belongs to another**, the law is well settled . . . that the owner may recover in an action for money had and received.

*Grimes v. Trimble*, 1873 WL 11310, at *1 (Ky. June 5, 1873) (emphasis added). Plante, at trial, conceded that Seanor had not received money that belonged to him.

Plante's success on the contract claim dooms the unjust enrichment claim:

> To recover on a claim of unjust enrichment a plaintiff is required to "prove the following three elements: '(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value.'" *Furlong Dev. Co. v. Georgetown-Scott Cty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39-40 (Ky. 2016) (quoting *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. App. 2009)). Because unjust enrichment is rooted in equity and "law trumps equity" *Bell v. Commonwealth*, 423 S.W.3d 742, 748 (Ky. 2014), courts frequently note that **"unjust enrichment is unavailable when the terms of an express contract control."** *Furlong Dev. Co.*, 504 S.W.3d at 40 (citing *Sparks Milling Co. v. Powell*, 283 Ky. 669, 143 S.W.2d 75, 76 (Ky. 1940); and *Bates v. Starkey*, 212 Ky. 347, 279 S.W. 348, 350 (Ky. 1926)).

*Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777-78 (Ky. 2017). The contract recovery eliminates need for an equitable remedy. The Court notes, however, that the proof otherwise supports an unjust enrichment recovery. If the Court

had found no contract, it would have applied an unjust enrichment theory in the case. Seanor, in that scenario, would have been an inequitable free rider (an expensive one, at that) on Plante's litigation vehicle. Given the context, circumstances, and history, allowing Seanor to retain sizable litigation benefits without carrying a fair share of the cost would have been unjust. Because the contract resolves the case, the Court need not resort to equity.

## III. CONCLUSION

Seanor's incredible testimony cannot compete with the strength and force of Plante's competent and persuasive proof. The Court credits Plante's testimony and the documentary evidence and finds, by clear and convincing evidence, that Seanor agreed to repay 50% of the parties' litigation fees out of any recovery and that Seanor breached the agreement. Therefore, Plante is entitled to judgment and damages, in accordance with the parties' oral contract. The Court so finds and concludes, on the specifics stated in this Opinion & Order.

For all these reasons, the Court **FINDS** in favor of Plaintiff Paul Plante. The Court will enter a separate Judgment consistent with the ruling herein.

This the 2nd day of November, 2018.

**Signed By:**

**_Robert E. Wier_**

**United States District Judge**